IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| SAGE BUSH,<br><br>        PLAINTIFF,<br><br>v.<br><br><br>MICHIGAN STATE UNIVERSITY,<br>MICHIGAN STATE UNVERSITY BOARD OF<br>TRUSTEES, LOU ANNA SIMON in her individual<br>and official capacity as President,<br>JESSICA NORRIS in her individual and official<br>capacity as Title IX Coordinator,<br>ANDE DUROJAIYE in his individual and official<br>capacity as Deputy Title IX Coordinator and<br>Director of the Office of Institutional Equity,<br>LAUREN SPENCER in her individual and official<br>capacity as Office of Institutional Equity<br>Investigator,<br>and OTHER UNIDENTIFIED ROES,<br><br>        DEFENDANTS. | HON.<br><br><br>CASE No. |

Karen Truszkowski (P56929)
Temperance Legal Group PLLC
503 Mall Court #131
Lansing, MI 48912
844-534-2560 phone
800-531-6527 fax
karen@temperancelegalgroup.com

## **COMPLAINT AND JURY DEMAND**

Plaintiff, SAGE BUSH, by and through her attorney, KAREN TRUSZKOWSKI, hereby

files the following complaint against Defendants as captioned above.

1

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

2. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because the events giving rise to this claim occurred in this judicial district, and because Plaintiff and Defendants are both located in this judicial district.

## THE PARTIES

3. Plaintiff was, at all material times, an enrolled undergraduate student at Michigan State University.

4. Defendant Michigan State University ("MSU") is a public university receiving federal funds.

5. Defendant MSU is governed by Defendant Michigan State University Board of Trustees. ("Trustees").

6. Defendant Lou Anna Simon ("Simon") at all material times was the President of Michigan State University.

7. Defendant Jessica Norris ("Norris") at all material times was the MSU Title IX Coordinator. Plaintiffs are informed and allege that as the Title IX Coordinator Defendant Norris was responsible for oversight of all Title IX-related activities at the University. Defendant Norris was later promoted to Associate Vice-President of the Office for Civil Rights and Title IX Compliance.

8. Defendant Ande Durojaiye ("Durojaiye") at all material times was the Deputy Title IX Coordinator and Director of the Office of Institutional Equity ("OIE"). Plaintiffs are informed and allege that as the Deputy Title IX Coordinator and Director of the Office of

Institutional Equity, Defendant Durojaiye was responsible for supervising the Title IX investigators as well as the day-to-day operations of the Title IX office.

9.  Defendant Lauren Spencer ("OIE Investigator") at all material times was the Title IX Investigator assigned to Plaintiff's reports to OIE.

## APPLICABLE LAW AND POLICY

10. MSU receives federal financial assistance and is subject to the dictates of Title IX.

11. Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . .

12. Title IX is implemented through the Code of Federal Regulations. See 34 C.F.R. Part 106.

13. 34 C.F.R § 106.8(b) provides:

> . . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part.

14. In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1988), the United States Supreme Court recognized that a recipient of federal educational funds intentionally violates Title IX, and is subject to a private damages action, where the recipient is "deliberately indifferent" to known acts of teacher-student discrimination.

15. While a school in itself may not be committing the sexual harassment, it can be said to be intentionally discriminating if it knows of severe and pervasive sexual harassment occurring within its control, for example, and does nothing.  *Gebser*, 524 U.S. at 290.

16. In *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), the United States Supreme Court extended the private damages action recognized in Gebser to cases where the harasser is a student, rather than a teacher.

17. *Davis* held that a complainant may prevail in a private Title IX damages action against a school district in cases of student-on-student harassment where the funding recipient is:

    (a) deliberately indifferent to sexual harassment of which the recipient has actual knowledge, and
    (b) the harassment is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.
    *Davis*, 526 U.S. at 1669-76.

## BACKGROUND FACTS

18. The Defendant Trustees, by the Michigan State Constitution, are vested with the authority to supervise, control, and govern MSU.

19. The Office of Civil Rights ("OCR"), a division of the United States Department of Education ("USED"), is responsible for the implementation, interpretation, and enforcement of Title IX.

20. The OCR has promulgated numerous documents outlining the requirements for an educational institution to comply with Title IX, including the 2014 Dear Colleague Letter ("DCL"), which deals specifically with peer-on-peer harassment and sexual assault. Although the DCL was rescinded in 2017, its provisions still apply to the events enumerated within.

21. The USED was authorized by Congress to promulgate regulations to govern the implementation, interpretation, and enforcement of Title IX.

22. The 2014 DCL is a "significant guidance document," intended to provide educational institutions with clarity as to the requirements they must follow in order to be in compliance

with the USED.   Pursuant to 72 Fed. Reg. 3424, a "guidance document" was "an agency statement of general applicability and future effect, other than a regulatory action…that sets forth a policy on a statutory, regulatory, or technical issue or an interpretation of a statutory issue."

23. The 2014 DCL specifically outlines the requirements that educational institutions were required to follow regarding peer-on-peer sexual harassment and assault at the time of the events detailed in this complaint.

24. At the time of the events detailed in this complaint, a failure to adhere to the requirements outlined in the DCL could result in the loss of federal funding for an educational institution.

25. In 2010 and 2011, the OCR initiated investigations into MSU after three separate complaints were filed against the institution to determine if MSU had violated their requirements under Title IX regarding the handling of complaints of sexual harassment and sexual assault on campus.

26. In September 2015, the OCR released its report regarding the findings of its investigation of MSU.  Among the findings are the following:

- MSU failed to notify students and employees of MSU's notice of non-discrimination.

- MSU failed to notify students and employees of the name or title of the Title IX Coordinator.

- MSU had grievance policies that were not compliant with Title IX.

- MSU failed to respond to reports of sexual harassment and sexual violence in a prompt and equitable manner, thereby causing and contributing to a sexually hostile environment of campus.

5

27. Although MSU's policy at the time was to complete an investigation of sexual harassment within, at most, 120 days of the initial report, MSU consistently failed to comply with this policy.

28. At the time of the conduct alleged in this complaint, MSU had a policy to always provide information about interim measures available to protect complainants who filed complaints of Title IX violations, whether or not the complainant wanted to pursue an investigation. Interim measures could include the following:

- No contact directives

- Housing reassignment

- No trespass orders

- Interim suspensions

- Changing class schedules

- Academic assistance and accommodations

## COMMON ALLEGATIONS REGARDING PLAINTIFF

### *Incident #1*

29. The Plaintiff began her freshman year at MSU in the fall of 2015.

30. On or about November 2015, the Plaintiff began a social and or romantic relationship with a fellow MSU student ("JOHN ROE1").  JOHN ROE1 was 20-21 years old and upon information and belief, a junior or senior.

31. JOHN ROE1 was a personal trainer.  He was approximately 6'3" and 180 pounds, whereas the Plaintiff is 5'6" and 115 pounds.

32. JOHN ROE1 routinely emotionally, mentally, sexually, and physically abused Plaintiff during their romantic relationship.

6

33. The abuse escalated, such that in January 2016, the Plaintiff informed JOHN ROE1 that she no longer was interested in a relationship with JOHN ROE1.

34. JOHN ROE1 expressed an interest in maintaining a relationship with Plaintiff, despite the Plaintiff's express representation that Plaintiff was not interested in a friendship.

35. Over the summer of 2016, Plaintiff and JOHN ROE1 communicated occasionally by text and social media but had no face-to-face contact.

36. When school began in the fall of 2016, JOHN ROE1 contacted Plaintiff and asked if they could get together.  In October 2016, Plaintiff agreed to meet JOHN ROE1 at his apartment.

37. During that meeting, despite Plaintiff's protests, and her express representation that she was not interested in anything more than a platonic relationship with JOHN ROE1, JOHN ROE1 forced himself on the Plaintiff and he sexually assaulted her. After the assault, the Plaintiff left JOHN ROE1's apartment.  At that point, Plaintiff did not report what had occurred to police or the university.

38. After the assault, JOHN ROE1 threatened Plaintiff with the knowledge that he knew where she lived and that he knew how to get into her dormitory room.

39. Based upon his threats and earlier erratic behavior, Plaintiff was genuinely fearful that JOHN ROE1 would assault her again.

40. Plaintiff routinely saw JOHN ROE1 running by her dormitory, even though JOHN ROE1 lived in Capitol Villa Apartments, and would have no reason to be in the vicinity of Plaintiff's dormitory.

***Incident #2***

41. On the evening of November 11, 2016, the Plaintiff agreed to pick up a friend ("JOHN ROE2") that was at the fraternity house of Sigma Kappa, the MSU chapter of the national fraternity Delta Kappa Epsilon.  At the time, JOHN ROE2 was a member of the Sigma Kappa fraternity, but he did not live in the fraternity house.

42. Plaintiff was acquainted with JOHN ROE2 and other members of the fraternity as Plaintiff was in the same academic program as JOHN ROE2 and other fraternity members.

43. Plaintiff and JOHN ROE2 were planning to get late-night food in a MSU residential dining room, but upon Plaintiff's arrival at the fraternity house JOHN ROE2 indicated that he did not want to leave immediately.

44. Plaintiff went inside the fraternity house and obtained a cup of water herself from the kitchen tap.

45. Plaintiff did not consume any alcohol, although alcohol and recreational drugs were readily available.

46. Plaintiff remembers seeing drugs and alcohol being used by both fraternity and non-fraternity members both on that night, and during previous visits to the house.

47. Although a toxicology screen later showed cannabinoids in Plaintiff's system, Plaintiff does not remember smoking or consuming marijuana or any other drug that night.

48. Plaintiff, at the fraternity for the sole purpose of picking up her friend, had no intention of engaging in lengthy socializing with other men in the house.

49. The Plaintiff recalls that, when she arrived at the Sigma Kappa fraternity house, it appeared to be at the end of a party with approximately 12 people present.

50. The last thing that the Plaintiff remembered clearly after arriving at the house was complimenting an unknown adult woman on her scarf.

51. Plaintiff eventually woke up in an upstairs room of the fraternity house.

52. Upon waking, Plaintiff began to feel dizzy, had double-vision, had difficulty walking, was confused, and intermittently blacked out. She was not aware of how much time had passed. She did not recognize her surroundings.

53. Plaintiff made her way to the stairs. Although she had difficulty walking, Plaintiff attempted to maneuver down the stairs.

54. The fraternity president of the Sigma Kappa chapter of Delta Kappa Epsilon was at the bottom of the stairs.

55. The Plaintiff asked the fraternity president to call 911. Despite the obvious difficulties Plaintiff was experiencing, the fraternity president refused to call 911.

56. Plaintiff managed to call 911 herself.

57. Eventually the Plaintiff found herself on the front porch of the fraternity house being attended to by EMS and or police.

58. Plaintiff was taken by ambulance to Sparrow Hospital at approximately 3:00 a.m. on November 12, 2016, where she was diagnosed as having a drug overdose.

59. Plaintiff underwent a toxicology screening while at the hospital and marijuana was found in her system, but no alcohol or other drugs.

60. Although Plaintiff recalls hospital personnel asking Plaintiff if she wanted a Sexual Assault Nurse's Exam ("SANE"), Plaintiff was confused and scared, was still in shock, and declined the SANE. Plaintiff realized later that she had been sexually and physically assaulted.

61. The Plaintiff was discharged from Sparrow Hospital at approximately 9:00 a.m. on November 12, 2016.

62. Following her discharge from the hospital, the Plaintiff experienced extreme pain throughout her body.  Plaintiff had extreme muscle aches in her torso, extremities, and her genital area.

63. Plaintiff instinctively knew she had been sexually assaulted based upon how her body felt physically.

64. The Plaintiff managed to take her fall 2016 semester final exams and finished that semester.

### *FIRST MEETING WITH OIE*

65. After final exams in December 2016, the Plaintiff contacted the Office of Institutional Equity ("OIE") to arrange a meeting with an OIE investigator.

66. Upon information and belief, the OIE Investigator was new in her position, was not adequately trained, and Plaintiff was one of her first "investigations."

67. Plaintiff met with the OIE Investigator after final exams in December 2016.

68. Plaintiff brought her long-time childhood friend ("Sally")[1] to the meeting with the OIE Investigator.

69. The meeting with the OIE Investigator lasted less than an hour.

70. During that meeting, the Plaintiff provided the OIE Investigator with details about both incidents.  Plaintiff expressed concerns about her fear of JOHN ROE1, and the retaliation she experienced from members of the fraternity.

71. In response to the Plaintiff's report of the two incidents, the OIE Investigator responded by stating to Plaintiff, "*You're lucky.  It could've been a lot worse.*"

---

[1] Sally is a pseudonym to protect Sally's identity.

72. Plaintiff was not advised by the OIE Investigator to seek sexually transmitted infection ("STI") or pregnancy testing, a forensic exam, a physical exam, or any other medical treatment.

73. The OIE Investigator told the Plaintiff that Plaintiff could press criminal charges against JOHN DOE1, but said, "*It's hard to prove, probably nothing would come of it, and you would have to see* [the alleged perpetrators] *which would be more damaging*."

74. The OIE Investigator did not refer Plaintiff to the Michigan State University Sexual Assault Program ("SAP") nor did the investigator mention the SAP.

75. The OIE Investigator did not offer Plaintiff academic accommodations or a referral to the Resource Center for Persons with Disabilities ("RCPD").

76. The OIE Investigator did not offer Plaintiff interim measures.

77. Although the Plaintiff was informed of her right to have a no-contact directive against JOHN DOE1 put into place, Plaintiff felt discouraged from doing so because of the OIE Investigator's statements.

78. Despite knowing that JOHN ROE1 had threatened Plaintiff, the OIE investigator discouraged the Plaintiff from seeking a no-contact directive against JOHN ROE1 because Plaintiff "*did not see JOHN ROE1 often, he was graduating soon, and Plaintiff did not have any classes with him*."

79. The OIE Investigator discouraged the Plaintiff from pursuing anything whatsoever against JOHN ROE1 because, "[*JOHN ROE1] was a senior, he would be gone soon, and there would be a negative notation on his transcripts*."

80. The OIE Investigator also discouraged the Plaintiff by stating to Plaintiff, "*You would not want to ruin his* [JOHN ROE1] *chances of getting into a graduate program*."

81. The Plaintiff felt as if the OIE Investigator was implying that the Plaintiff was responsible for JOHN ROE1's future and that JOHN ROE1's future was more important than the Plaintiff's future.

82. Plaintiff was not informed of her right, under Title IX and MSU's Relationship Violence and Sexual Misconduct ("RVSM") Policy, to be protected from retaliation.

83. Additionally, the OIE Investigator discouraged the Plaintiff from going to law enforcement about the incident at the Sigma Kappa chapter of the Delta Kappa Epsilon fraternity house because, *"Fraternities are complicated."*

84. Plaintiff was so discouraged by the representations made by the OIE Investigator she became frightened to the point that she decided she could not report the incident(s) to law enforcement.

85. Although the Plaintiff was told that the OIE Investigator would follow up with the Plaintiff, the only further communication the Plaintiff had from the investigator was a cursory email.

86. Since the assaults, Plaintiff has been prescribed multiple medications to help her with the resulting depression, anxiety, panic attacks, Post-Traumatic Stress Disorder, and insomnia.

87. Before the incidents, the Plaintiff was an exemplary student with a strong academic record. Since the assaults, the Plaintiff's grades have plummeted, and she has failed classes.

88. There is nothing that has changed in Plaintiff's life or in her commitment to her education that could have negatively impacted her grades so significantly other than the sexual assault and the resulting indifference by OIE.

89. The Plaintiff was informed by one of her friends of the existence of the SAP. Plaintiff sought assistance from the SAP on her own as the OIE Investigator had not informed her of the available SAP services.

90. The Plaintiff also sought assistance from the RCPD on her own sometime in 2017.

91. In the fall of 2018, Plaintiff requested academic accommodations from RCPD.  As part of that request, the Plaintiff again had to disclose the traumatizing incidents of 2016.

92. In the fall of 2018, Plaintiff's assaults were reported to OIE by a MSU employee that Plaintiff confided in.  That employee was a mandatory reporter.

93. As a result of the report to OIE, the OIE office reached out to the Plaintiff to offer the Plaintiff the option of meeting with an investigator again.

94. In January 2019, at MSU's request, the Plaintiff again met with an OIE Investigator.  That investigator was the same investigator that Plaintiff met with in the fall of 2016.

95. The OIE Investigator told the Plaintiff that the Plaintiff was one of the investigator's first OIE assignments, insinuating that the investigator was not adequately trained.

96. Because of the lack of training, it is clear that the OIE Investigator did not do an adequate job of informing the Plaintiff of her Title IX rights, or her options to report when she first met with Plaintiff in fall 2016.

97. As reported by the State News the MSU chapter of Delta Kappa Epsilon has had the highest number of reported sexual assaults occur in the last four years, not including the incidents that happened with Plaintiff.[2]

98. MSU recognizes and authorizes the local chapter of Delta Kappa Epsilon.

99. Discouraging female students from reporting sexual assaults committed by fraternity members, as the OIE Investigator did to Plaintiff, plausibly creates an environment where male fraternity members can sexually assault women without repercussions.

100.     This environment creates a heightened risk of sexual assault for women.

---

[2] The State News, *Inside the Fraternities: The State News Investigates sexual misconduct,* November 2017.

101.     MSU has been under scrutiny regarding its handling of sexual assault cases, especially regarding prominent figures on the MSU campus. MSU has been and continues to be under investigation by the Michigan Attorney General, the National Collegiate Athlete Association ("NCAA"); the Michigan Legislature; the United States Congress and Senate; the U.S.  Department of Education, Office for Civil Rights; and the U.S. Department of Education, Federal Student Aid Division.

102.     MSU has not been transparent when dealing with various investigators, agencies, and media regarding sexual assault incidents and/or allegations.

103.     MSU created and fostered an unwritten and unofficial policy of treating certain sexual assault complaints differently depending upon the identity of the alleged perpetrator.

104.     MSU's policy was designed to suppress public knowledge and prevent investigation of perpetrators to the detriment of the sexual assault victims.

> (a)     This policy emboldens perpetrators and gives them unwritten permission to commit acts of sexual assault without consequences

> (b)     MSU created an atmosphere and culture in which women became vulnerable to predatory men.

### ***TRENDS NOTICED BY THE SEXUAL ASSAULT PROGRAM DIRECTOR***

105.     Shari Murgittroyd, ("Murgittroyd"), a previous director of the SAP, supervised the SAP counselors from 2005 through 2015.[3]

---

[3] In addition to her time as the SAP Director, Shari Murgittroyd is a trauma therapist who is qualified as an expert witness in the area of sexual assault trauma and domestic violence.  She teaches a class at MSU entitled Power, Privilege, and Intimate Violence.

106.    In her role as Director of the SAP, Murgittroyd made the following observations about the MSU culture of minimizing or even ignoring sexual harassment.

107.    Administrators at MSU including the OIE investigator that the Plaintiff met with were not trained in sensitive, trauma-based response and thus discouraged victims from reporting sexual assaults.

108.    MSU staff and faculty perpetrated a culture of minimizing or ignoring sexual harassment. This was evidenced by the lack of action from the administrators and investigators, as well as unchecked retaliation after reports, especially involving perpetrators with institutional privilege and power.

109.    There is an undeniable culture of fear around reporting assaults committed by perpetrators of power on MSU's campus.

110.    Sex offenders, particularly those with power or influence, are not held accountable for their actions at MSU.

111.    When sex offenders are not held accountable for their actions through the MSU OIE office, or the criminal justice system, it is a message to the offenders that victims are not heard or taken seriously and gives them the "green light" to perpetrate more sexual assaults without consequences.

112.    The MSU culture allowed for serial rapists to continue to target and prey on other victims in the student body.

113.    Victim safety is not a priority for MSU, or students would not be discouraged from reporting sexual assault and harassment.

114.    Instead, students would be encouraged to report and seek advocacy and counseling services from trauma-informed experts in the SAP.

115.    MSU's policy of non-support of victims puts students at a heightened risk of sexual assault.

116.    As a professionally trained sexual assault therapist and social worker, Murgittroyd made the following observations about the dynamics of sexual assault perpetration.

117.    Sex offenders are serial in nature and premeditate assaults against victims who are less likely to report.

118.    Most victims are raped by someone they know, and perpetrators intentionally assault within their own social circle because these victims are less likely to report.

119.    In its final report resulting from its investigation into complaints against MSU dated September 1, 2015, the OCR determined the following: "talking into account all of the evidence gathered during the investigation, OCR determined that a sexually hostile environment existed for and affected numerous students and staff on campus at the University during the time period covered by OCR's investigation; and that the University's failure to address complaints of sexual harassment, including sexual violence in a prompt and equitable manner caused and may have contributed to a continuation of this sexually hostile environment."

120.    Despite findings of the final OCR report dated September 1, 2015, the Defendant MSU continued its practice of discouraging sexual assault victims from reporting.

121.    MSU's policy of non-support of victims constitutes discrimination against female students, depriving them of their right to an educational environment free of sex-based harassment, which is required under Title IX.

### ***ASSAULT VICTIMS' MEDICAL AND COUNSELING RECORDS ARE REVIEWED BY MSU GENERAL COUNSEL BEFORE THE RECORDS ARE RELEASED— IMPARTING A CHILLING EFFECT ON STUDENTS SEEKING COUNSELING SERVICES***

122.　　When students request their medical and or counseling records from the Sexual Assault Program, they are "interviewed" by counseling department personnel who ask the purpose for requesting their personal counseling records.

123.　　Once the student requesting their records has been interviewed, the student is informed that their records will have to be reviewed by the Michigan State University's Office of General Counsel before the records are released to the student.

124.　　Knowing that the university's legal department is reviewing students' highly personal counseling and medical records intimidates students into not asking for their records so as to not have information of a confidential nature disclosed to the attorneys that represent the university.

125.　　Knowing that their records are subject to review by the University's Office of General Counsel intimidates students from seeking help from the counseling programs and other university programs.

126.　　Students do not have the reasonable expectation that when they seek counseling or medical treatment from university programs, their confidential counseling and medical information is subject to the "review" of university attorneys simply because the treatment is administered by a university-affiliated health care provider.

127.　　Upon information and belief, the University's Office of General Counsel office does not review records of a more mundane nature such as a broken ankle. Records

regarding sexual assault counseling and medical treatment are treated differently than records of a more mundane nature.

128.     When Plaintiff requested her complete counseling records in November 2018, she was interrogated by the current SAP Director, Tana Fedewa, who asked the Plaintiff why the Plaintiff wanted her records.

129.     Ms. Fedewa told the Plaintiff that once the records were released, that SAP "*had no control over what the records could be used for*."

130.     The Plaintiff felt embarrassment and humiliation asking for her own medical records.

131.     Upon information and belief, other female students have been discouraged from obtaining their medical and counseling records in a similar fashion.

## COUNT I
## VIOLATION OF TITLE IX
## (20 U.S.C. § 1681, *et seq*)
## AGAINST ALL DEFENDANTS

Paragraphs 1 through 131 and all subparts are incorporated by reference as if stated in full herein.

132.     The sex-based harassment articulated in Plaintiff's general allegations was so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to educational benefits provided by MSU.

133.     Defendants created and/or subjected Plaintiff to a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX), because:

(a) Plaintiff, a female student, was a member of a protected class.

18

(b) Plaintiff was subjected to sexual harassment in the form of a sexual assault by other MSU student(s).

(c) Plaintiff was subjected to harassment based on her sex.

(d) Defendants created the circumstances which permitted the sexual assault to take place by failing to follow normal reporting and investigative procedures regarding sexual assault and failing to properly train staff.

(e) Defendants' failure to follow normal protocols in order to protect the university and failure to properly train staff cultivated an environment in which female students became vulnerable to sexual assault.

(f) Plaintiff was subjected to a hostile educational environment created by Defendants' lack of effective and appropriate policies and procedures to properly prevent, investigate, and address sexual assault and harassment and/or lack of implementation of effective and appropriate policies and procedures to properly prevent, investigate, and address sexual assault and harassment.

134.   Defendants' failure to promptly and appropriately respond to the sexual assault resulted in Plaintiff, based on her gender, being excluded from participation in, being denied the benefits of, and being subjected to discrimination in MSU's education program in violation of Title IX.

135.   Defendants failed to take immediate, effective remedial steps to resolve the complaint of sexual harassment and instead acted with deliberate indifference toward Plaintiff.

136.    Defendants persisted in their actions and inaction even after they had actual knowledge of the harm suffered by Plaintiff, and despite the September 1, 2015, Resolution Agreement it entered into with OCR.

137.    Defendants engaged in a pattern and practice of behavior designed to discourage and dissuade students who had been sexually assaulted from seeking assistance and protection.

138.    Defendants engaged in suppressing sexual assault grievances, violated its own policies regarding sexual assault investigations, violated Title IX, and provided preferential treatment to male perpetrators.

139.    This pattern and practice resulted in an unwritten, unofficial policy of protecting perpetrators and discouraging complainants from reporting.

140.    This policy constitutes disparate and unequal treatment of female students and   has a disparate impact on female students.

141.    As enumerated above, the Defendants acted with deliberate indifference in deviating from the standard of care outlined by USED in the Dear Colleague Letter of 2011.

142.    Plaintiff has suffered emotional distress, psychological damages, physical manifestation of psychological distress, humiliation, loss of self-esteem, loss of enjoyment of life, loss of earnings, loss of earning capacity, academic failures, and past and ongoing medical expenses as a direct and proximate result of Defendants' deliberate indifference to her rights under Title IX.

## COUNT II
## VIOLATION OF § 1983
## (42 U.S.C. § 1983)
## AS TO ALL DEFENDANTS

Paragraphs 1 through and 142 and all subparts are incorporated by reference as if stated in full herein.

143.  Under the Fourteenth Amendment, Plaintiff, a female university student, had the right to Equal Protection of Laws. Defendants were state actors acting under color of state law.

144.  Defendants subjected Plaintiff to violations of her right to and Equal Protection of Laws by maintaining a custom, policy and/or procedure:

(a)  Of actively discouraging victims of sexual assault from reporting sexual assaults, especially when the perpetrator is a member of a fraternity or other prominent organization or membership group on campus.

(b)  Of failing to notify sexual assault victims of their Title IX protections, rights and accommodations.

(c)  Of failing to notify sexual assault victims of all reporting and confidentiality options.

(d)  Of failing to adequately train administrators, employees and others in a position to discover, report, investigate or prevent the acts complained of herein, which amounted to the above referenced violations of constitutional rights and / or federal law.

145.  Plaintiff has suffered emotional distress, psychological damages, physical manifestation of psychological distress, humiliation, loss of self-esteem, loss of enjoyment

of life, loss of earnings, loss of earning capacity, academic failures, and past and ongoing medical expenses as a direct and proximate result of Defendant's deliberate indifference to her rights under Title IX.

### COUNT III
### MICHIGAN'S ELLIOTT-LARSEN CIVIL RIGHTS ACT
### (SEX DISCRIMINATION)
### AS TO ALL DEFENDANTS

Plaintiff incorporates Paragraph 1 through 145 and all subparts of this Complaint as if fully set forth herein.

146.     Plaintiff is a member of a protected class pursuant to Michigan's Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq*. and MCL 37.2301, *et seq*.

147.     The facilities operated by the Defendant Michigan State University were and are an educational institution under the ELCRA, MCL 37.2401 et seq. and MCL 37.2301 *et seq*.

148.     Defendant Michigan State University's policies and practices, including a failure to properly warn, train, and/or educate its students regarding the prevention of sexual harassment and/or assault, and the failure to properly investigate reports of sexual harassment and assault have a disparate impact on Plaintiff as a woman by subjecting her to increased levels of sexual abuse, assault and other violence on campus in comparison to male students and by subjecting her to increased levels of emotional distress and other harm by virtue of Defendants' failures to promptly and appropriately address complaints of sexual assault.

149.     Defendant Michigan State University's acts and omissions based upon Plaintiff's gender have resulted in harm to Plaintiff including physical and emotional harm, and

Plaintiff being denied privileges and opportunities that should be available to MSU students in violation of MCL 37.2103 *et seq*.; and MCL 37.2701(a)(f).

**COUNT IV**
***MONELL* LIABILITY FOR**
**FAILURE TO TRAIN AND SUPERVISE**
**AS TO RESPONSE TO SEXUAL HARASSMENT**
**AS TO ALL DEFENDANTS EXCEPT SPENCER**

Paragraphs 1 through 149 are hereby incorporated by reference as if set forth in full herein.

150.     Defendants Simon, Durojaiye, and Norris were "state actors" working for Michigan State University, a federally funded state university.

151.     The OIE Investigator acted under "color of law" when, as a new, inadequately trained OIE investigator, she failed to inform Plaintiff of her rights and available resources to assist with the aftermath of both reported incidents.

152.     The OIE Investigator's actions indicated to Plaintiff that Plaintiff was responsible for JOHN ROE1's future and that despite John Roe1 threatening Plaintiff's well-being not to get a protective or no contact order.

153.     The OIE Investigator discouraged Plaintiff from reporting to the police because "*it would be difficult to prove.*"

154.     Defendants Simon, Durojaiye, and Norris failed to preserve Plaintiff's constitutional rights to equal protection as guaranteed by the Fourteenth Amendment by failing to train the OIE Investigator properly.

155.     Under the Equal Protection Clause of the Fourteenth Amendment, Plaintiff had the right to equal access to an educational environment free from harassment and discrimination.

156.    The OIE Investigator should have been trained that her response to sexual harassment must comply with federal law, particularly as outlined in Title IX's published and widely promulgated implementing regulations.

157.    Defendants Simon, Durojaiye, and Norris each violated Plaintiff's right to equal access by:

    (a)    Failing to take steps to protect Plaintiff as necessary;

    (b)    Treating Plaintiff with deliberate indifference;

    (c)    Failing to take steps to properly investigate the report made by Plaintiff; and

    (d)    Failing to ensure that the OIE investigator who interacted with Plaintiff was properly trained.

158.    Defendants Michigan State University and Michigan State University Board of Trustees violated Plaintiff's Fourteenth Amendment right to equal protection by failing to properly train and supervise its employees as to these mandated investigative requirements.

159.    These policies and/or practices constituted disparate treatment of women and had a disparate impact on female students.

160.    Defendants' actions and lack of actions were the proximate cause of Plaintiff's emotional distress and psychological damage because of Defendants' deliberate indifference to her right to equal protection under the Fourteenth Amendment.

WHEREFORE, Plaintiff respectfully requests judgment in her favor and against Defendants as follows:

A.    Compensatory damages for Plaintiff's psychological and emotional distress, physical manifestation of emotional distress, embarrassment, loss of self-esteem,

humiliation, loss of enjoyment of life, prevention of obtaining full enjoyment of life, loss of earnings past, present, and future, loss of earning capacity, past, present, and future expenses for medical and psychological treatment and therapy; Punitive damages;

B.   Injunctive relief requiring Defendants to take effective steps to prevent sex-based discrimination and harassment, including sexual assault, in all its programs and activities; fully investigate conduct that may constitute sex-based harassment and/or sexual assault; mitigate the effects of harassment and/or assault including by eliminating any hostile environment that may arise from or contribute to it;

C.   Statutory interest;

D.   Costs;

E.   Reasonable attorney fees; and

F.   Any other relief the Court deems appropriate.


DATED:  November 10, 2019          /s/ *Karen Truszkowski* (P56929)
                                   Karen Truszkowski
                                   Temperance Legal Group PLLC
                                   503 Mall Court #131
                                   Lansing, MI 48912
                                   1-844-534-2560 phone / 1-800-531-6257 fax
                                   Karen@temperancelegalgroup.com

## JURY DEMAND

Now comes Plaintiff by and through her attorney, Karen Truszkowski, and demands a trial by jury.

DATED:   November 10, 2019  /s/ *Karen Truszkowski* (P56929)
             Karen Truszkowski
             Temperance Legal Group PLLC
             503 Mall Court #131
             Lansing, MI 48912
             1-844-534-2560 phone / 1-800-531-6257 fax
             Karen@temperancelegalgroup.com